UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JOHN BURTON,<br>　　Plaintiff,<br>　vs.<br>CRYSTAL BENSON, et al.,<br>　　Defendants. | NO. CV-06-0273-JLQ<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSAL WITH PREJUDICE** |

## I.　INTRODUCTION

Plaintiff brought this 42 U.S.C § 1983 action against the Defendants, who at all relevant times, were employees of the Washington State Department of Corrections. In addition, Plaintiff alleges state law claims against the Defendants (except Benson) for negligent hiring, supervision and retention of Defendant Benson. **BEFORE THE COURT** is Defendants Adkins, Bradford, Kopp, Holmes, and Wiggs' (herein referred to as the "supervisor Defendants") Motion for Summary Judgment (Ct. Rec. 198) and Plaintiff's Motion for [Partial] Summary Judgment Re: Crystal Benson's Liability (Ct. Rec. 202). While Crystal Benson has not individually sought summary judgment that she was not acting "under color of state law" at the time of the events in question, the other Defendants have so moved and that matter is now ripe for adjudication.

On May 4, 2009, the court heard oral argument. Participating on behalf of Plaintiff was Kenneth Kato. Representing the Defendant Benson was Gina Costello. Appearing on behalf of the moving state supervisor Defendants was Assistant Attorney General, Jarold Cartwright.

The supervisor Defendants seek dismissal of the claims against them on the following grounds:

1. Benson was not acting under color of state law.

ORDER - 1

2. Defendants Adkins, Wiggs, Holmes, Bradford, and Kopp did not participate in the assault and the evidence is insufficient to establish these defendants placed Burton in danger or were deliberately indifferent to a high risk that Benson would violate Burton's rights;

3. The alleged failure to properly supervise Benson was not a proximate cause of injury and damage to the Plaintiff;

4. Adkins, Wiggs, Holmes, Bradford, and Kopp are protected from suit by qualified immunity; and

5. The elements of Plaintiff's state law negligence claims can not be established by competent evidence.

Ct. Rec. 200 at 4.

Plaintiff seeks partial summary judgment on the issue of Benson's "liability" on his civil rights claim, arguing "liability" is established because collateral estoppel operates to preclude Benson from disputing that she stabbed Burton with the intent to rob him.

For the reasons which follow, the court grants Defendants' Motion for Summary Judgment and directs dismiss with prejudice of all the federal claims in the Fifth Amended Complaint, including the sole federal claim pleaded against Defendant Benson. The court's ruling makes Plaintiff's summary judgment motion against Benson on his § 1983 claim moot.

**II.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A.   Facts**

At all relevant times, Defendant Crystal Benson was a community corrections officer ("CCO") employed by the Washington State Department of Corrections. Benson never supervised Plaintiff John Burton on parole or otherwise. Benson knew of Burton as a drug source through a mutual acquaintance known as "Chase" and as a drug dealer from whom she believed she might be able to obtain crack cocaine for her own personal use. On the afternoon of Friday, February 27, 2004 Benson approached Burton on the street in Spokane, Washington, requesting to buy crack cocaine.

ORDER - 2

Burton sold Benson three "rocks" of crack cocaine for fifty dollars, then rode with Benson to the residence of his girlfriend. They entered the residence and while there, Benson told Burton she was a corrections officer with the DOC and showed Burton a badge and gun. Benson was not authorized by the State to carry a firearm. Benson did not threaten Burton and told him she was *not* going to arrest him. Burton took a shower while Benson waited for him. Benson and Burton jointly smoked the crack cocaine.

Benson took Burton to her residence where they had sexual intercourse. Benson then cooked a hamburger for him. In the early morning hours of February 28, 2004, Benson hit a seated Burton in the back of the head with a cast iron frying pan. Burton was stunned by the blow to the back of the head and attempted to leave Benson's residence. Benson stabbed him in the lower back with a butterfly knife. Burton pulled the knife out and staggered out the door to get away. Burton knocked on a neighbor's door and asked for help.

When police arrived Mr. Burton told Officer Ames he was attacked on the street and stabbed and that he did not know who did it. Burton was taken to the hospital where he spent five days recovering, then left against medical advice.

There is no evidence Benson was working at the time she approached Plaintiff on the street, or at any time that day. Benson has no recollection of being at work that day. Benson subsequently requested sick leave for that day.

Burton had a criminal record and had been supervised by the Department of Corrections in the past. Benson had never supervised Burton and Burton was not under supervision on February 27, 2004. On March 7, 2004, Benson was observed in the DOC office by co-worker Renee Cooper. Benson told Cooper she had been raped and Cooper insisted that she report what happened to her supervisor and the police.

On March 9, 2004, Burton called the Spokane Police Department and reported that the person who had hit and stabbed him was Benson. The same day, Benson reported to Spokane Police detectives that she had been raped by a person she had hit in the head and then stabbed.

Ultimately, Benson was charged with providing false information to a police

officer and attempted second degree murder.  She pleaded guilty to an Amended Information charging her with attempted first degree robbery.  She served a prison sentence.  Burton was not charged with a crime as a result of the incident of February 27-28, 2004.

Defendant Jack Kopp had been employed with the State of Washington Department of Corrections since 1981 and was a Field Administrator from 2002-2004. He was a second level supervisor whose authority included reviewing hiring recommendations and forwarding them for approval as well as providing input on discipline decisions.  He passed away in March of this year.  No motion has been made to substitute his estate.

Defendant Steve Holmes was employed with the state from 1976 to 2007.  In the years 2002-2004 he was a Community Corrections Supervisor.  He was a first level supervisor whose authority included recommending employees for hire and taking corrective action against them.

Defendant Todd Wiggs has been employed by the State since 1987.  In the years 2002-2004, he was a Community Corrections Supervisor.

Defendant Kaye Adkins was employed from 1987 until 2008 with the State.  In the years 2002-2004 she was the Department of Corrections Regional Administrator for the Northeast Region.  Her authority included final approval for all hiring, determining misconduct, and taking disciplinary actions.

Defendant Lois Bergstrom (formerly Bradford) has been employed with the state since 1982.  In the years 2002-2004 she was the Regional Human Resource Manager for the Northeast Region.  In that position her authority included providing counsel and advice regarding compliance with the collective bargaining agreement, agency policy, and labor/civil rights laws.

### *Benson's Employment History*

Benson was hired by the DOC on August 12, 1991.  She resigned to accept other employment in 1992.  On April 1, 1993, she was hired again by the DOC at Coyote Ridge Corrections Center as a probationary Recreation Leader 2.  On October 17, 1994,

ORDER - 4

she accepted a voluntary demotion to the Division of Community Corrections as a Community Corrections Officer 1 in-training. She was assigned to the Broadway building in Spokane. She was promoted to Community Corrections Officer 2 a year later and on March 12, 2001, Defendant Wiggs became Benson's supervisor. On January 31, 2002, Benson was reassigned to the North Maple office in Spokane, where her supervisor was Defendant Steve Holmes. On March 31, 2004, Benson resigned from her employment with DOC in lieu of termination based upon the incident involving Burton.

During her employment with the DOC, Benson was disciplined and/or warned about misconduct.

On August 6, 2001, Benson was reprimanded for failing to report to work.

On October 26, 2001, Benson was disarmed and assigned to work at home. The DOC undertook an internal investigation of a report by a clerical worker in the DOC office where Benson worked alleging she had seen infected sores on Benson's arms and that Benson had told her they were from injecting cocaine. Defendant Kopp assigned Defendant Wiggs to investigate the report. When confronted about the report, Benson denied the report and said the sores on her arm were caused by burns from a hot oven rack. When asked to show her arms, she invoked her right not to show her arms.

Benson was also investigated concerning alleged misuse of a scancard for personal use, an office theft, and signing out into the field without fully performing her work.

On January 11, 2002, a hearing was held by Defendant Adkins, DOC Regional Administrator, concerning the October, 2001 allegation that Benson had injected cocaine in her arm. Adkins consulted with Defendant Bradford and reviewed the investigation. Adkins determined the report of misconduct could not be substantiated and no discipline was imposed.

On February 5, 2002, Benson was counseled by her supervisor about the need to report her intention to take sick leave.

On or about June 17, 2002, it was noted Benson had a confrontation with another employee.

In July 2002, Benson applied for and was granted a leave of absence under the

ORDER - 5

Family Medical Leave Act (FMLA).  Benson's physician, Dr. Henry Montgomery, indicated on a "Shared Leave Medical Certificate" provided to the DOC that Benson suffered from a serious condition which required treatment. He described the medical conditions afflicting Benson as including "[d]epression, PTSD [post traumatic stress disorder], anxiety, sleep difficulties, poor concentration, impaired focus, increased emotional lability, sadness, [and] angry outbursts." Ct. Rec. 226, Ex. X.  In March 2003, Dr. Montgomery advised the DOC that Benson was cleared to return to work from the medical leave of absence, which she did. She was not authoriz3ed to carry a firearm.

In March 2003, there were two incidents of her using profane language and making sexually-oriented remarks in the workplace which were offensive to others.

On October 13, 2003, a performance evaluation by Defendant Holmes noted that Benson's random UA monitoring of offenders under her supervision appeared deficient and she needed to work on improving her interpersonal skills with co-workers.

<u>Criminal History Checks</u>

DOC Policy 810.015 required all applicants to be "carefully screened prior to initial appointment as an employee..." Part of this policy required a criminal background check for official records pertaining to *convictions*.  In addition, applicants were required to complete a criminal disclosure disclosing all convictions.  Benson disclosed no convictions to the DOC upon her hiring in 1993.

DOC policy 810.015 mandates that "applicable criminal history/background information...be maintained...in the file."  This rule is interpreted to require that only the results of criminal history showing prior <u>convictions</u> be maintained by the local human resource office.  According to the declaration of Lois Bergstrom, if there are no convictions, the record of the criminal history check is not kept.  DOC policy 810.015 requires criminal history be checked through WASIS/NCIC III Check/WACIC/NCIC Check.

In addition, pursuant to DOC policy 410.220 CCOs who carried firearms were subject to requirements to "qualify" with the firearm and criminal background checks were done on the employee each time the re-qualification took place.

ORDER - 6

No record of any criminal background check is in Benson's DOC personnel file.

<u>Firearm</u>

On October 26, 2001, Benson's DOC firearm was taken away pending the outcome of the investigation of an "employee conduct report" alleging Benson had injected cocaine in her arm. Benson was placed on "home assignment" pending the outcome of the investigation.

On January 31, 2002 Benson returned to work, but her firearm was not returned to her. On July 16, 2002, Benson took an approved leave of absence under the FMLA and returned to work on March 3, 2003. When she returned to work, she was advised that due to the length of her absence, it would be necessary for her to re-take the academy firearms class before she could be authorized to carry a firearm on the job. Benson chose not to carry a firearm. Because Benson did not seek to re-qualify to possess a firearm, a criminal history check was not performed when Benson returned to work.

On the dates of the subject incident, February 27-28, 2004, Benson was not authorized by the DOC to carry a firearm and the firearm Benson showed to Burton was not a DOC issued firearm.

<u>Benson's Criminal History</u>

Ms. Benson's criminal history includes a 1997 conviction in Connell, Washington Municipal court for disorderly conduct. Details of this conviction are not in the record. Ms. Benson was also arrested in 1999 after a domestic violence incident with her ex-husband. According to Benson's deposition testimony she called the police because her husband had put a gun to her head when she would not get out of the way of his aim at her son. She, her son, and her ex-husband were cited for domestic violence (fourth degree assault) because police could not tell whose version of the incident was truthful. No conviction resulted.

**B. Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to

ORDER - 7

judgment as a matter of law. Fed.R.Civ.P. 56( c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows that there is an absence of evidence to support the non-moving party's claims, the burden shifts to the non-moving party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305-06 (9th Cir. 1982).

To successfully rebut a properly supported motion for summary judgment, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inference made in the plaintiff[ ]'s favor, could convince a reasonable jury to find for the plaintiff[ ]." *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citations omitted).

**C. Analysis**

**1. Federal Causes of Action under 42 U.S.C. § 1983**

42 U.S.C. § 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States," by a person "acting under color of state law." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *See Graham v. Connor*, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Ketchum v. Alameda County*, 811 F.2d 1243, 1245 (9th Cir. 1987). The Constitution protects individual rights only from government action, and not from private action; it is only when the government is responsible for the specific conduct of which the Plaintiff complains that individual constitutional rights are implicated. *Single*

ORDER - 8

*Moms, Inc. v. Montana Power Company*, 331 F.3d 743, 746-47 (9th Cir. 2003).

### a.     Liability based upon *Benson's* Conduct Under Color of State Law

The question of whether Defendant Benson acted under color of law is determinative as to Benson's liability since the § 1983 action is the only claim against her. It is also relevant to the supervisory defendants' liability because a supervisor can only be held liable *for his/her subordinate's misconduct* if the wrongful action by the employee was under color of state law. If the constitutional injury was the result of private action as opposed to state action, the only basis Plaintiff could proceed on against a supervisor would be the supervisor's own constitutionally deficient conduct, as opposed to his/her subordinate's conduct. Plaintiff asserts both grounds as a basis for liability.

A person acts under color of state law if he "exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins*, 487 U.S. at 49 (citation and internal quotation marks omitted). Generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law. *See Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir. 1991). A public official's actions are not taken under color of state law, however, if they are not in any way related to the performance of his duties as a public official. *See id.* The private actions of a public official are not, simply by virtue of the official's governmental employment, accomplished under the color of state law. *See Johnson*, 113 F.3d at 1117-18. An official's actions may be under color of state law, however, if he purports or pretends to act under color of state law, even if his goals are private and outside the scope of his authority. *See Huffman v. County of Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998); *Van Ort v. Elate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996), *cert. denied*, 519 U.S. 1111, 117 S.Ct. 950, 136 L.Ed.2d 837 (1997).

The Ninth Circuit has held that there are "three critical requirements" that must be satisfied when determining if an individual who invokes his law enforcement status is acting under the color of state law. *Anderson v. Warner*, 451 F.3d 1063, 1069-70 (9th

Cir. 2006).

> First, the defendant's action must have been "performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties." *McDade*, 223 F.3d at 1140. Second, the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 839-40 (9th Cir. 1996) (finding no color of state law because the victim had not opened the door based on defendant's status as a police officer). Third, the challenged conduct must be "related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Martinez*, 54 F.3d at 987.

*Id.* at 1069. In *Anderson*, the court held that a lieutenant employed by the county sheriff's department was acting under color of state law even though he was off-duty and not wearing a uniform because he invoked his law enforcement status as a "cop" to keep bystanders from interfering with his assault on a motorist who rear-ended his personal vehicle. *Id.* at 1069-70. Against this backdrop, the court turns to the facts of the present case.

Here, the record shows that Benson's conduct does not meet the *Anderson* requirements. It can not be disputed that Benson, in connecting with Burton, was acting purely in the ambit of her own personal pursuit of crack cocaine. Her goals in contacting Burton were private and outside the scope of any authority or interests of the DOC. No portion of Benson's conduct on February 27-28, 2004 was meaningfully related to or under pretence of the performance of her official duties as a corrections officer. Interactions with Burton were not in the course of Benson's duties at the DOC at the time she assaulted him.

The only action which could be interpreted as pretending to act in the performance of official duties is when she showed Burton her badge and her own gun, and told him she was a corrections officer, but not to worry, she was not going to arrest him. Drawing all inferences in Plaintiff's favor, the court recognizes that this conduct could have been interpreted as asserting that she had the authority (and ability) to arrest him. Burton testified in his deposition in this case that he felt threatened because of her CCO status.

Though he may have felt intimidated, there is no evidence from which it can be inferred that Benson's subsequent conduct had the *effect* of influencing Burton's behavior, which is the requirement imposed by *Anderson*. Moreover, it can't be

ORDER - 10

reasonably inferred from these statements that Benson invoked her official authority to accomplish the later act of assaulting and stabbing the Burton. The brief pretense of Benson at Burton's residence ended when the two continued on to Benson's house, had sexual intercourse, followed by Benson attacking him with a frying pan and butterfly knife.

The assault on Burton by Benson was during a purely personal relationship. No reasonable jury could find that Benson was acting in an official capacity under color of state law when she hit him over the head with a frying pan and stabbed him in the back.

Accordingly, the single claim of a federal constitutional violation against Defendant Benson (for violation of substantive due process) necessarily fails. As a result, *Benson's* private conduct can not be the basis for liability of any of the supervisor Defendants.

**b.    Denial of Substantive Due Process under "state–created danger" theory**

Even in the absence of a finding that Benson was acting under color of state law, Plaintiff still contends liability may be imposed on the supervisor Defendants, arguing he has a viable claim against them for violation of due process under the Fourteenth Amendment under the "state-created danger" doctrine. Plaintiff alleges the supervisor Defendants each played a role in creating the opportunity for and facilitating the assault on Burton, both by their alleged actions and alleged inactions. Defendants move for summary judgment on this claim, arguing that Plaintiff can not establish an essential element of such a claim, i.e., that the supervisor defendants could and should have foreseen assaultive behavior by Benson and that their conduct was the proximate cause of the assault on Burton.

The legal theory of Plaintiff's claim is known as the "state-created danger theory." The U.S. Supreme Court has stated that a person generally has no due process right to be protected by the government against violence inflicted by a private actor, and therefore the Due Process Clause will not afford a basis for an action under § 1983 for injury due to such violence. *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989). "Only under highly limited circumstances

ORDER - 11

does the government have a duty to protect individuals from deprivations of constitutional rights by private individuals." *Van Ort v. Stanewich*, 92 F.3d 831, 836 (9th Cir. 1996), cert. denied, 519 U.S. 1111, 117 S.Ct. 950, 136 L.Ed.2d 837 (1997). These limited circumstances are divided into two categories: "(1) the special relationship exception; and (2) the danger creation exception." *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (internal citations and quotations omitted), cert. denied, 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993).

Plaintiff does not raise the special-relationship exception, nor could it apply because it is reserved for custody and involuntary hospitalization. The state-created danger theory requires the Plaintiff to "demonstrate, at the very least, that the state acted affirmatively and with deliberate indifference, in creating a foreseeable danger to the plaintiff leading to the deprivation of the plaintiff's constitutional rights." *Huffman v. County of Los Angeles*, 147 F.3d 1054, 1061 (9th Cir. 1998) (internal citations omitted). In a more recent case, the court stated that in order to prevail on the state created danger theory a plaintiff must first show that "the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 197, 109 S.Ct. 998). In addition, under this exception "[p]ointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection." *Van Ort*, 92 F.3d at 837. Rather, "the policy must be the proximate cause of the section 1983 injury." *Id.* Moreover, the "state's awareness of dangers is insufficient ... if the state 'played no part in their creation' or did 'anything to render [the plaintiff] any more vulnerable to them.'" *Estate of Imrie v. Golden Gate Bridge*, 282 F.Supp.2d 1145, 1149 (N.D.Cal. 2003) (quoting *DeShaney*, 489 U.S. at 201 n. 2).

The Ninth Circuit first considered the danger creation exception in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). In *Wood* a woman, who was left in a dark area late at night and was

ORDER - 12

raped after the car in which she was a passenger was impounded by a police officer, brought a § 1983 action against the officer. *See id.* at 586. The court held that because the officer " 'affirmatively placed the plaintiff in a position of danger,' " the officer could be held liable under § 1983. *Id.* at 589-90 (*quoting Ketchum v. County of Alameda*, 811 F.2d 1243, 1247 (9th Cir. 1987)). The Ninth Circuit has subsequently found that a plaintiff alleged a triable danger creation claim in *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992)(holding that state employees could be liable under the state created danger exception for the rape of a registered nurse assigned to work alone in the medical clinic of a medium security prison with a known, violent sex offender after being assured that she would never work alone). See also *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997) (per curiam)(state created danger exception claim viable where police officers who, after finding plaintiff in grave need of medical care on his front porch, cancelled a 911 call for paramedics, put him back in his home and locked him inside); *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000)(state created danger claim viable for the hypothermia death of a visibly drunk patron dressed in a t-shirt and jeans after officers ejected him from a bar on a bitterly cold night and told him not to drive anywhere); and *Kennedy v. City of Ridgefield*, 439 F.3d 1055 (9th Cir. 2006)(police officer acted with deliberate indifference when he informed a known violent neighbor of plaintiff's allegations of child molestation without first warning plaintiff as the officer had promised to do and the neighbor thereafter shot the plaintiff and her husband).

These cases stand in stark contrast to the matter *sub judice*. Simply stated, the state-created danger theory can not apply where the conduct of the supervisory defendants did nothing to place Burton in any greater danger than already existed in his normal life. Plaintiff has not provided sufficient evidence from which a reasonable jury could infer that any of the moving Defendants either acted affirmatively, or were deliberately indifferent to a foreseeable danger, or that any affirmative conduct on their part proximately caused the assault upon Burton. Plaintiff's evidence in this case include Benson's disciplinary record, work evaluations, medical leave record evidencing her

ORDER - 13

mental health, allegations that Benson was using cocaine, and Benson's criminal history that Defendants did not discover -- that being an arrest for a domestic violence assault, a municipal conviction for disorderly conduct (which defendants had no record of at the time), and an undisclosed 2002 California drug conviction, apparently while Benson was on medical leave.

There has been no evidence proffered that Defendants actually **had knowledge of** a propensity for violence and drug use.  Instead, Plaintiff alleges the Defendants "bur[ied] their heads in the sand" (Ct. Rec. 227 at 6) and speculates that had Defendants acted more diligently in supervising her and scrutinizing Benson's background they *would have* become aware of cause for concern.  But the deliberate indifference standard of fault requires a disregard of a *known* or *obvious* consequence of his action or inaction. *Board of County Com'rs of Bryan County, Okl v. Brown*, 520 U.S. 397, 410-11 (1997). "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more likely cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Id.*

Not only is it not reasonably tenable that the supervisor Defendants' actions meet the strict standards of deliberately indifference, but it is not reasonably tenable that their conduct was the proximate cause of Benson's violent assault upon Burton.  This case can be compared to the Ninth Circuit *Van Ort* case, which Plaintiff does not distinguish.  In *Van Ort*, the claimants brought a § 1983 action against the County of San Diego because a sheriff's deputy, while off-duty, attacked and tortured them. 92 F.3d at 833-34. The claimants submitted a detailed description of the deputy's disciplinary record, which included unauthorized surveillances;  numerous citizen complaints for use of excessive and improper force;  and unwarranted violence in arrests and detentions.  *Id.* at 837. The Ninth Circuit held that although this evidence may have put the deputy's supervisors on alert that he could be violent on-duty, "the County could not reasonably have foreseen that [the deputy] would become a free-lance criminal and attack the [appellants] as he did." *Id.*  Thus, the deputy's "unforeseeable private acts broke the chain of proximate

ORDER - 14

causation" connecting the County's alleged liability for the claimants' injuries. *Id.*

The supervisory Defendants herein are entitled to summary judgment because the actions of Benson were private, intervening acts, which broke the chain of causation between any alleged failure of the Defendants and Plaintiff's injury. The allegation that Defendants "bur[ied] their heads in the sand" or failed to adequately investigate the allegation of cocaine use, does not address Benson's intervening private conduct.

Substantive due process does not "ensure that private individuals are protected from each other or themselves." *Estate of Imrie v. Golden Gate Bridge*, 282 F.Supp.2d 1145, 1148 (N.D.Cal. 2003). Plaintiff has failed to come forward with evidence from which a jury could reasonably infer the supervisory Defendants violated Burton's substantive due process rights by conduct which placed Burton in danger. Burton's injury can not be reasonably attributed to the conduct of any state actor. It was Benson and Burton themselves who privately chose to engage in the dangerous business of selling and using crack cocaine, which eventually lead to the altercation and violence against Burton. This had nothing to do with state action or inaction.

**c. Qualified Immunity**

Defendants have also raised the defense of qualified immunity. Qualified immunity shields government officials performing discretionary functions from civil liability if their actions were objectively reasonable in light of clearly established law at the time they acted. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

Analysis of the qualified-immunity defense generally proceeds under the two-step, sequential inquiry articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The first inquiry is whether the facts, viewed in the light most favorable to the party asserting injury, show the officer's conduct violated a constitutional right. When conducting this inquiry at the summary-judgment

ORDER - 15

stage, the court adopts the plaintiff's version of the facts. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. The second step of the qualified immunity analysis addresses whether the constitutional right at issue was clearly established such that reasonable official would have understood that his behavior violated that right. This inquiry is undertaken in light of the specific context of the case, not as a broad general proposition. In summary, if the official's alleged conduct violated a clearly established constitutional right of which a reasonable official would have known, he is not entitled to qualified immunity.

While it is often appropriate to address the qualified immunity analysis by considering these two steps in sequence, it is not mandatory. *Pearson,* 129 S.Ct. at 818 (2009)(modifying *Saucier v. Katz*). District courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.

Since the supervisor Defendants' conduct in this case does not amount to a constitutional violation, even when the facts are viewed in the light most favorable to Plaintiff, the qualified immunity inquiry need not proceed.

**2. State Law Cause of Action - Negligence**

Defendants have also moved for summary judgment on Plaintiff's state law negligence claims. The Fifth Amended Complaint alleges that defendants Wiggs and Holmes breached their duties as supervisors when they failed to require Benson to submit to urinalyses or monitor her drug use by any other method. It also alleges that defendants negligently hired and/or retained Benson given her "unmonitored history of illegal drug use and addiction, a history of arrests for assault, and allegations of violence and theft in the workplace, and use of official authority to obtain drugs or otherwise abuse official authority" which created a foreseeable risk of harm to the public.

Washington law provides,

> [A]n employer may be liable to a third person for the employer's negligence in hiring or retaining a servant who is incompetent or unfit. Such negligence usually consists of hiring or retaining the employee with knowledge of his unfitness, or of failing to use reasonable care to discover it before hiring or retaining him. The

ORDER - 16

> theory of these decisions is that such negligence on the part of the employer is a wrong to such third person, entirely independent of the liability of the employer under the doctrine of respondeat superior. It is, of course, necessary to establish such negligence as the proximate cause of the damage to the third person, and this requires that the third person must have been injured by some negligent or other wrongful act of the employee so hired.

*Scott v. Blanchet High Sch.*, 50 Wn.App. 37, 43, 747 P.2d 1124 (1987) (quoting 53 Am.Jur.2d Master and Servant § 422 (1970)) (emphasis added), review denied, 110 Wn.2d 1016 (1988).

Proximate cause consists of cause in fact and legal causation. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). "Cause in fact, or 'but for' causation, refers to 'the physical connection between an act and an injury.'" *Ang v. Martin*, 154 Wn.2d 477, 482, 114 P.3d 637 (2005) (quoting *Hartley*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985)). Cause in fact is generally a question of fact for the jury. *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 478, 951 P.2d 749 (1998). Legal causation is a question of law. *Kim v. Budget Rent A Car Sys., Inc.*, 143 Wn.2d 190, 204, 15 P.3d 1283 (2001). "[L]egal cause is grounded in policy determinations as to how far the consequences of a defendant's acts should extend." *Schooley*, 134 Wn.2d at 468. The legal causation analysis focuses on whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability. The determination of legal liability depends on "mixed considerations of logic, common sense, justice, policy, and precedent." *Schooley*, 134 Wn.2d at 479 (*quoting King v. Seattle*, 84 Wn.2d 239, 250, 525 P.2d 228 (1974)).

Plaintiff's state law claims suffer from the same proximate cause deficiency as the federal claim against the moving supervisor Defendants. In this case, Benson was hired as a community corrections officer. Drug dealing and use was not part of Benson's duties. If the Defendants had more closely and constantly scrutinized Benson's record (though Plaintiff has pointed to no policy which required them to), they would have learned that Benson had been convicted of a municipal disorderly conduct charge, arrested after a domestic violence incident in which police could not determine who was telling the truth, and an unspecified 2002 California drug conviction, apparently while Benson was on an extended medical leave. Defendants also could have, and in retrospect probably should

ORDER - 17

have, more closely monitored Benson for drug use.  However, these failures on the Defendants' part did not cause the harm to Burton.  Any harm to Burton in this case was completely outside the scope of Benson's duties.  Any connection between the state supervisor Defendants' conduct and Benson's assault on Burton with a frying pan and butterfly knife is too remote and unforeseeable to impose liability on them.

**D. Conclusion**

Plaintiff has failed to make a showing sufficient to establish that Defendant Benson was acting under color of state law or that the other supervisor Defendants deprived Burton of a constitutional right.  The moving Defendants are entitled to dismissal of all claims against them.

Although the dismissal of the federal civil rights claim eliminates all federal causes of action, the court exercises its discretion to continue supplemental jurisdiction over the remaining state law claims in view of the duration of the litigation, the value of judicial economy, and the court's familiarity with the facts and claims.  Plaintiff's state law negligence claims against Defendants Adkins, Bradford, Holmes and Wiggs shall also be DISMISSED with prejudice.

**III.    CONCLUSION**

For the foregoing reasons, the court hereby **GRANTS** Defendant's Motion for Summary Judgment **(Ct. Rec. 198)**.  All of the federal 42 U.S.C. § 1983 claims asserted in the Fifth Amended Complaint shall be dismissed with prejudice   Though she has not moved for summary judgment, the court's finding that Defendant Benson's conduct was not under color of state law necessitates dismissal of the singular § 1983 federal claim against her.  Plaintiff has not alleged any state law claim against Benson.

In addition, the court dismisses the pendent state law negligence claims against Defendants Adkins, Bradford, Holmes and Wiggs, leaving no remaining claims in the Fifth Amended Complaint.

Plaintiff's Motion for Summary Judgment **(Ct. Rec. 202)** is **DENIED** as **MOOT**.

The Clerk of the Court is directed to enter this order, ENTER JUDGMENT dismissing the Fifth Amended Complaint and the claims therein against all Defendants

with prejudice, provide copies to counsel, and **CLOSE THE CASE FILE.**

Dated this 11th day of May, 2009.

<pre>
                    s/ Justin L. Quackenbush
                 JUSTIN L. QUACKENBUSH
           SENIOR UNITED STATES DISTRICT JUDGE
</pre>